UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

ANITA PARKER, *an Individual*,                          Case No. 6:23-cv-00450-MTK

       Plaintiff,                                    **OPINION AND ORDER**

   v.

PEACEHEALTH, *a corporation*,

       Defendant.

_____

**KASUBHAI,** United States District Judge:

      Plaintiff Anita Parker ("Plaintiff") brings this religious discrimination claim against her former employer, Defendant PeaceHealth ("Defendant"). Plaintiff alleges Defendant violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-5 (Second Claim for Relief) and Or. Rev. Stat. § ("ORS") 659A.030 (First Claim for Relief) by failing to reasonably accommodate her religious beliefs when she objected to taking the COVID-19 vaccine. Defendant moves to exclude the opinions and report of Plaintiff's expert (ECF No. 26) and moves for summary judgment (ECF No. 15) on Plaintiff's claims. Defendant's motions are granted.

Page 1 — OPINION AND ORDER

## BACKGROUND

Defendant is a not-for-profit Catholic healthcare system with approximately 16,250 employees in medical centers, hospitals, and clinics across Alaska, Washington, and Oregon. Le Decl. ¶ 3, ECF No. 19. Its mission is to promote personal and community health through safe and compassionate care. Le Decl. ¶ 5, Ex. 1.

In early 2020, the SARS-CoV-2 virus, and the COVID-19 infection it causes, began spreading in Oregon. Koekkoek Decl. ¶¶ 4-5, ECF No. 17. Defendant mitigated exposure risks using screening, testing, masking, other forms of personal protective equipment ("PPE"), and social distancing. Le Decl. ¶ 7; Kroll Decl. ¶ 5, ECF No. 18. Once COVID-19 vaccines became available in December 2020, Defendant encouraged its employees to get vaccinated. Le Decl. ¶ 8; Kroll Decl. ¶ 6.

In the summer of 2021, a more transmissible and deadly Delta variant hit Oregon communities and hospitals. The number of COVID-19 cases increased by 300% nationwide. Koekkoek Decl. ¶ 37, Ex. 12 at 1. On August 3, 2021, Defendant announced it would require all employees to be fully vaccinated against COVID-19 by September 1, 2021, if able, and to show proof of COVID-19 vaccination or submit a medical or religious exemption on or before August 31, 2021. Koekkoek Decl. ¶ 29; Le Decl. ¶ 10, Ex. 2 at 5.

Defendant established a committee to review religious exemption requests and began processing such requests. Le Decl. ¶ 18. When Defendant approved a request for religious exemption, the employee's HR partner or supervisor initiated an interview with the employee. Le Decl. ¶ 21. Defendant placed exempted employees who could not work fully remotely on unpaid leave, permitting use of remaining PTO and continuing their health benefits coverage through the

later of November 30, 2021, or the end of the month in which they exhausted PTO. Le Decl. ¶ 23.

Defendant employed Plaintiff as a certified medical assistant in the Family Practice Department. Le Decl. ¶ 29. Plaintiff's job duties included preparing patients for examinations and treatment, giving injections, and collaborating with a variety of personnel and departments to ensure smooth clinic operations. Le Decl. Ex. 13 at 4. Plaintiff requested a religious exemption to Defendant's COVID-19 vaccine requirement, which Defendant approved. Le Decl. ¶ 30, Ex. 14; Riggs Decl. I Ex. 1 at 9 (RFA Response No. 4), ECF No. 16-1. Plaintiff's supervisor and HR partner interviewed Plaintiff to process her request and determined that she could not perform her duties as a medical assistant fully remotely. Le Decl. ¶ 31, Ex. 15; Riggs Decl. I Ex. 1 at 9 (RFA Response Nos. 2, 3). On September 1, 2021, Defendant placed Plaintiff on unpaid administrative leave. Le Decl. ¶ 32. Plaintiff filed her Complaint on March 29, 2023. Compl. ECF No. 1. She alleges that Defendant failed to reasonably accommodate her religious opposition to receiving a COVID-19 vaccine in violation of Title VII and ORS 659A.030.

## STANDARDS

### I. Federal Rules of Evidence 702 and *Daubert*

The admissibility of an expert's testimony is governed by Fed. R. Evid. 702, as elaborated by the Supreme Court in *Daubert* and its progeny. Rule 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of

reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

## II.    Local Rule 56-1(b)

Under LR 56-1(b), rather than filing a motion to strike, the moving party must assert any evidentiary objections in its reply memorandum. "If an evidentiary objection is raised by the moving party in its reply memorandum, the non-moving party may file a surreply memorandum . . . within seven days addressing only the evidentiary objection; the moving party may not file further briefing on its evidentiary objection." LR 56-1(b).

## III.    Motion for Summary Judgment — Fed. R. Civ. Pro. 56(a)

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be

viewed in the light most favorable to the nonmoving party. *T.W. Elec. Service, Inc.*, 809 F.2d at 630.

## DISCUSSION

Defendant contends that Plaintiff's expert's opinion and report are inadmissible evidence under Rule 702 and *Daubert* and moves for summary judgment on Plaintiff's claims. Defendant argues that it reasonably accommodated Plaintiff and as a matter of law it is entitled to prevail on its affirmative defense that it could not allow Plaintiff to continue working unvaccinated without undue hardship.

### I.  Defendant's Motion to Strike

Defendant moves under Rule 702 to exclude the opinions and report of Plaintiff's expert, Dr. French. Defendant asserts that Dr. French's opinions and report are inadmissible evidence because they are based on unreliable methodologies and reasoning. Defendant attaches to its motion the expert report of Dr. Cohen, a Clinical Associate Professor in the Division of Allergy and Infectious Diseases at the University of Washington and the Medical Director of Infection Prevention at the University of Washington Medical Center. Rigg's Decl. II Ex. 1 ("Cohen Report") ¶ 5, ECF No. 27-1. Dr. Cohen's report is a review of Dr. French's report and provides commentary on Dr. French's opinions and use of cited literature. Despite the opportunity to do so under LR 56-1(b), Plaintiff did not submit a surreply in response to Dr. Cohen's well-reasoned rebuttal report.

Dr. French is a board-certified emergency medicine physician. Expert Report of Dr. Richard Scott French ("French Report") ¶ 2, ECF No. 25-1. He attests to having extensive experience treating and managing COVID-19 patients in several states and extensive experience and expertise in setting up COVID-19 prevention protocols for hospital facilities. French Report

¶¶ 2, 7–10. Dr. French also has professional experience teaching and presenting at medical schools on immunology, as well as viral transmission prevention, diagnosis, treatment, and management. French Report ¶ 4. The French Report can be categorized into two overarching opinions: (1) the safety and efficacy of the COVID-19 vaccine are unproven, and (2) COVID-19 exposure risks can be effectively mitigated without requiring vaccination.[1]

When ruling on a motion to strike under Rule 702 and *Daubert*, trial judges are tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Supreme Court in *Daubert* elaborated that expert testimony should be based on a reliable and scientifically valid methodology that fits with the facts of a case. *Id.* at 592–93. "Under *Daubert*, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145 (1999)).

"For scientific opinion, the court must assess the reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one. Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010) "[T]he trial court has discretion to decide how to test an expert's reliability as well as whether the testimony

---

[1] In ruling on the admissibility of Dr. French's opinions, the Court need not, and does not, opine on the truth of these opinions. Rather, the Court's ruling is narrowly tailored to whether Dr. French's opinions are based on reliable methodologies and reasoning under Rule 702 and *Daubert*.

is reliable, based on 'the particular circumstances of the particular case.'" *Id.* (quoting *Kumho Tire Co.*, 526 U.S. at 147).

The Court must ensure that the French Report is reliable by examining "whether the expert's testimony reflects scientific knowledge, whether their findings are derived by the scientific method, and whether their work product amounts to good science." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (*Daubert II*) (quotation marks removed) (citing *Daubert*, 509 U.S. at 591–93). And the Court must ensure that the French Report is relevant in that it "logically advances a material aspect of [Plaintiff's] case." *Id.*

The Court has reviewed the French Report and finds that every portion of it falls below the admissibility standard. For the purposes of explanation, the Court discusses the following three significant examples.

In support of his opinion that the COVID-19 vaccines are neither safe nor effective, Dr. French relies on Exhibit 6, which he describes as a "a comprehensive report with many graphs, charts, references and [a] description of their methodology." French Report ¶ 26, citing Ex. 6[2] ("Rancourt Study"). Dr. French's explanation of the Rancourt Study's scientific legitimacy is cursory and grossly deficient. That the Rancourt Study includes a description of the authors' methodology and contains many graphs, charts, and references is not indicative of its scientific legitimacy. Similarly, its 180 pages proves only its length, not its quality. Having conducted "a preliminary assessment of whether the reasoning or methodology underlying [the French Report]

---

[2] Dr. French labelled two different exhibits as Exhibit 6. The Court's reference to Exhibit 6 relates to the second Exhibit 6, pdf pages 64-243 of the French Report, Rancourt, D.G., Baudin, M., Hickey, J., Mercier, J. "COVID-19 vaccine-associated mortality in the Southern Hemisphere". *CORRELATION Research in the Public Interest*, Report, 17 September 2023. https://correlation-canada.org/covid-19-vaccine-associated-mortality-in-the-Southern-Hemisphere/.

is scientifically valid", *Daubert*, 509 U.S. at 592–93, the Court finds that the Rancourt Study is junk science.[3]

The Rancourt Study is a "study regarding COVID-19 vaccine-associated mortality in the Southern Hemisphere looking at the excess mortality rate associated with COVID-19 vaccines in 17 countries, spanning four continents." Rancourt Study at 1-3. It claims "there is no evidence . . . of any beneficial effect of COVID-19 vaccines." *Id.* at 1-2. Despite being a correlative study, the authors claim that "[t]he scientific tests for causality are amply satisfied, [and] extensively demonstrate[ ] . . . COVID-19 vaccines did not save lives and appear to be lethal toxic agents[.]" *Id.* at 131. Purportedly, its "analysis of ACM [(all cause mortality)] by time in the 17 countries studied shows that the global COVID-19 vaccination campaign was in effect a mass iatrogenic event that killed $(0.213 \pm 0.006)$ % of the world population [(approximately 17,000,000 people)] and did not measurably prevent any deaths." *Id.* at 119.

The Rancourt Study's "[m]ethod is designed for cases (jurisdictions) in which there is no evidence in the ACM data for mortality caused by factors other than the vaccine rollouts." *Id.* at 16. The study's methodology is grossly flawed. It relies on a finding that, "no excess mortality occur[ed] in the [COVID-19] pre-vaccination period." *Id.* This finding is baseless given that the data relied on shows that following vaccine rollouts, excess ACM decreased in eight of the 17 countries studied. *Id.* at 26. When looking at the Rancourt Study's data for the 17 countries combined, excess ACM also decreased following vaccine rollouts. *Id.* (table 1, showing total excess ACM in the year preceding vaccine rollout as 2,392,831, and total excess ACM following

---

3 *Oxford English Dictionary* defines "junk science" as "[s]cientific assertions or conclusions which are presented as fact but based on flawed or biased research or analysis[.]" *Junk Science*, Oxford English Dictionary, (online ed. 2023) https://doi.org/10.1093/OED/2767395868 (last visited Nov. 8, 2024).

vaccine rollout as 1,744,829). Plaintiff fails to rebut Defendant's expert's compelling opinion that the Rancourt Study "[i]nexplicably . . . ignores that excess deaths across the world correlated with spikes of confirmed COVID-19 cases rather than vaccine rollouts." Cohen Report ¶ 19. Lastly, Dr. French also fails to explain why the Rancourt Study, and his opinion from which it flows, are reliable despite running contrary to broad scientific consensus that the COVID-19 vaccines are safe. Koekkoek Decl. ¶ 32.

Dr. French's expert opinion is also unreliable because he misconstrues the exhibits cited in his report. In support of his opinion on vaccine efficacy, Dr. French cites to Exhibit 2, an outbreak report describing the transmission of COVID-19 that occurred at a large public event in a Massachusetts town in the summer of 2021. French Report, Ex. 2[4] ("Outbreak Report") at 1. The Outbreak Report found that 74% of the COVID-19 cases occurred in people who were fully vaccinated. *Id.* From this finding, Dr. French opines that "even as early as 2021, the literature did not demonstrate that the COVID-19 vaccines were effective in transmission mitigation of COVID-19 infection." French Report ¶ 31, citing Ex. 2.

Contrary to Dr. French's opinion, the Outbreak Report explicitly states that "vaccination is the most important strategy to prevent severe illness and death." Outbreak Report at 2. The Outbreak Report continues, "[a]s population-level vaccination coverage increases, vaccinated persons are likely to represent a larger proportion of COVID-19 cases." *Id.* In other words, the fact that many of the people infected at the public gathering were fully vaccinated merely reflects high vaccination rates in that geographical area at the time. The Outbreak Report concludes,

---

4 Brown, Catherine M. "Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings — Barnstable County, Massachusetts, July 2021." MMWR. Morbidity and Mortality Weekly Report 70 (2021). https://doi.org/10.15585/mmwr.mm7031e2.

"data from this report are insufficient to draw conclusions about the effectiveness of COVID-19 vaccines against SARS-CoV-2, including the Delta variant, during this outbreak." *Id.* at 3. The limitation on the conclusions to be drawn from the data do not call into question the efficacy of COVID-19 vaccines. Rather, the mismatch between Dr. French's opinion and the findings and recommendations of the evidence he relies on, calls into question his capacity to comprehend scientific literature. His specious use of the Outbreak Report undermines the reliability of his methods and reasoning.

Similarly, Dr. French incorrectly concludes that Exhibit 3 "indicate[s] that the COVID-19 vaccine was in fact increasing the risk of COVID-19 transmission." French Report ¶ 15, citing Ex. 3. Exhibit 3 is a cohort study on community transmission in vaccinated and unvaccinated individuals in the UK. French Report Ex. 3[5] ("Cohort Study") at 1. Dr. French's opinion is troubling, given that the Cohort Study explicitly recommends "[i]ncreasing population immunity via booster programmes and vaccination" and concludes that "[this] analysis suggests that direct protection of individuals at risk of severe outcomes, via vaccination and non-pharmacological interventions, will remain central to containing the burden of disease caused by the delta variant." *Id.* at 12. Dr. French's opinion directly contradicts the scientific research it relies on. Dr. French's interpretation of the Outbreak Report and the Cohort Study are at best incompetent, and at worst, dishonest.

This Court is not alone in finding that Dr. French's opinion on this subject falls below accepted standards of reliability. *See Malone v. Legacy Health*, No. 3:22-CV-01343-HZ, 2024

---

[5] Singanayagam, Anika, Seran Hakki, Jake Dunning, Kieran J. Madon, Michael A. Crone, Aleksandra Koycheva, Nieves DerquiFernandez, et al. "Community Transmission and Viral Load Kinetics of the SARS-CoV-2 Delta (B.1.617.2) Variant in Vaccinated and Unvaccinated Individuals in the UK: A Prospective, Longitudinal, Cohort Study." The Lancet. Infectious Diseases 22, no. 2 (February 2022): 183–95. https://doi.org/10.1016/S1473-3099(21)00648-4.

WL 3316167, at *3 (D. Or. July 5, 2024) (admonishing Dr. French for his misrepresentation of Exhibits 2 and 3 and citing other district court cases where misrepresentations of these same reports have been called out). Based on the unreliable methods and reasoning of Dr. French, the Court finds that Dr. French's opinions are inadmissible under Rule 702 and *Daubert*.

## II.    Motion for Summary Judgment

Plaintiff brings religious discrimination claims based on Defendant's alleged failure to reasonably accommodate her religiously based opposition to receiving a COVID-19 vaccine. Defendant moves for summary judgment on the grounds that there is no genuine dispute that, under the circumstances, allowing Plaintiff to work in person in a healthcare setting would have been an undue hardship and that it reasonably accommodated Plaintiff with unpaid leave. Plaintiff responds that material disputes of fact remain regarding (1) the safety and efficacy of COVID-19 vaccines; (2) the process Defendant used to determine the vaccine mandate; (3) and the process Defendant used when deciding to place Plaintiff on unpaid leave.

### A.    Title VII — Failure to Accommodate

Under Title VII, "[t]o establish religious discrimination on the basis of a failure-to-accommodate theory, [the plaintiff] must first set forth a prima facie case that (1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004). If established, the burden then shifts to the defendant to show that it "initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Id.* Courts construe Oregon's statutory counterpart, Or. Rev. Stat. § 659.030, as identical to Title VII. *Heller v. EBB Auto Co.*, 8 F.3d

1433, n.2 1437 (9th Cir. 1993). The Court analyzes the state and federal claims under the same legal standards.

On April 24, 2023, the Court bifurcated the present case into two phases, Phase One consisted of two threshold legal questions: (1) was continuing to allow Plaintiff to work at the hospital unvaccinated an undue hardship on Defendant, and (2) was unpaid leave a reasonable accommodation? Order, ECF No. 11. Phase Two related to the prima facie showing of a failure to accommodate claim. The Court set a dispositive motion deadline on the Phase One questions and ordered Phase Two discovery stayed pending the outcome of Phase One dispositive motions. The Court finds that Defendant is entitled to summary judgment on its affirmative defense of undue hardship. Because undue hardship is dispositive, the Court does not address whether unpaid leave was a reasonable accommodation.

      1.    <u>Undue Hardship</u>

Until recently, some lower courts interpreted *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977) as holding that an undue hardship under Title VII is merely something more than *de minimis*. *Groff v. DeJoy*, 600 U.S. 447, 471 (2023). In *Groff v. DeJoy*, 600 U.S. 447 (2023), the Supreme Court clarified that under Title VII, an "'undue hardship' is shown when a burden is substantial in the overall context of an employer's business." *Id.* at 468. Whether a burden is substantial is a fact-specific inquiry that should be resolved in a "common-sense manner." *Id.* at 471. Under the *Groff* standard, "courts must apply the test in a manner that takes into account all relevant factors in the case at hand." *Id.* at 470. For example, courts may consider "the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of an employer." *Id.* (citation to record and alterations omitted). Consistent with this contextualized and common-sense approach, when conducting an undue hardship analysis, the Court finds it appropriate to consider the following factors: (1) the information available at the

time the defendant made its accommodation decision; (2) economic and non-economic costs of

the accommodation; and (3) the cumulative or aggregate effects of an accommodation requested

by multiple, similarly situated employees.[6]

Pre-*Groff* EEOC guidance on the undue hardship standard remains instructive. *Id.* at 471

(rejecting full adoption of EEOC's pre-*Groff* interpretation of undue hardship but explaining a

"good deal of the EEOC's guidance in this area is sensible and will, in all likelihood, be

unaffected by" the Court's clarifying decision). Specific to evaluating undue hardship in the

context of COVID-19 vaccinations, the EEOC provides sensible and relevant guidance

consistent with *Groff*:

> Considerations relevant to undue hardship can include, among other things, the proportion of employees in the workplace who already are partially or fully vaccinated against COVID-19 and the extent of employee contact with non-employees, whose vaccination status could be unknown or who may be ineligible for the vaccine. (§ K.12, Updated May 28, 2021).

> Costs to be considered include not only direct monetary costs but also the burden on the conduct of the employer's business—including, in this instance, the risk of the spread of COVID-19 to other employees or to the public. . . . An employer cannot rely on speculative or hypothetical hardship when faced with an employee's religious objection but, rather, should rely on objective information. Certain common and relevant considerations during the COVID-19 pandemic include, for example, whether the employee requesting a religious accommodation to a COVID-19 vaccination requirement works outdoors or indoors, works in a solitary or group work setting, or has close contact with other employees or members of the public (especially medically vulnerable individuals). Another relevant consideration is the number of employees who are seeking a similar accommodation, i.e., the cumulative cost or burden on the employer. (§ L.3, Updated March 1, 2022).

*What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO*

*Laws,* EEOC (last visited September 25, 2024), https://www.eeoc.gov/wysk/what-you-should-

---

6 For a thorough and well-reasoned explanation of these three factors and their relation to *Groff*, *see Lavelle-Hayden v. Legacy Health*, No. 3:22-CV-01752-IM, 2024 WL 3822712, at *8–*10 (D. Or. Aug. 14, 2024).

know-about-covid-19-and-adarehabilitation-act-and-other-eeo-laws [https://perma.cc/73RS-7L62].

2.    <u>Defendant's Evidence of Undue Hardship</u>

Here, Defendant asserts that for employees who could not work fully remotely, any accommodation other than leave created an undue hardship by significantly increasing the health and safety risks of its employees and patients. Plaintiff responds that allowing her to continue to work using pre-vaccine protocols would not have created an undue hardship, and that Defendant failed to conduct an individual analysis before placing her on leave.

Having found that the opinions of Plaintiff's expert are inadmissible, Plaintiff's Response in opposition to Defendant's Motion for Summary Judgment is unsupported by admissible evidence. Nonetheless, the Court must view all inferences drawn from the underlying facts in the light most favorable to Plaintiff and resolve all reasonable doubts as to the existence of genuine issues of material fact against Defendant. *T.W. Elec. Service, Inc.*, 809 F.2d at 630.

Defendant relies on the declarations of the following individuals to support its affirmative defense of undue hardship. First, Defendant relies on the declaration of Dr. Koekkoek, Defendant's Chief Physician and Clinical Executive. Koekkoek Decl. ¶ 2. During the summer of 2021 he led Defendant's clinical response to the COVID-19 pandemic and was a member of the Senior Leadership Team. *Id.* ¶ 3. Dr. Koekkoek was also a member of Defendant's Ethical Discernment team, which, after deliberations, decided to implement Defendant's vaccination policy in August 2021. *Id.* ¶¶ 25–29. Second, Defendant offers the declaration of Catherine Kroll, Defendant's System Director of Infection Prevention. Kroll Decl.  ¶ 2. Ms. Kroll has worked in Defendant's Infection Prevention Department for over 10 years and has held the System Director role since 2022. Kroll Decl. ¶ 2. And third, is the declaration of Caroline Le, Defendant's Program Director for HR Integration. Le Decl. ¶ 2. Ms. Le has worked in

Defendant's HR department for approximately ten years and was elevated to program director in February 2021. Le Decl. ¶ 2. Ms. Le facilitated Defendant's system-wide implementation of its COVID-19 mandate. Le Decl. ¶ 9. Each of these declarations is further supported by numerous exhibits, none of which Plaintiff meaningfully challenges. The Court explores Defendant's evidence in detail below.

Throughout the pandemic, Defendant relied on federal and state recommended and mandated safety measures to develop its policies and responses to the COVID-19 outbreak. Le Decl. ¶ 8; Kroll Decl. ¶¶ 4, 13; Koekkoek Decl. ¶ 9. Early in the pandemic, Defendant mitigated exposure risks using screening, testing, masking, other forms of PPE, and social distancing. Le Decl. ¶ 7; Kroll Decl. ¶ 5. Once COVID-19 vaccines became available in December 2020, Defendant encouraged its employees to get vaccinated. Le Decl. ¶ 8; Kroll Decl. ¶ 6. However, by late July 2021, 19.7% of Defendant's Oregon employees remained unvaccinated or declined to state their vaccination status. Le Decl. ¶ 13.

In the summer of 2021, a more transmissible and deadly Delta variant hit Oregon communities and hospitals. Koekkoek Decl. ¶¶ 10–11. Nationwide, the number of COVID-19 cases increased by 300%. Koekkoek Decl. ¶ 37,[7] Ex. 12 at 1. Defendant monitored COVID-19 forecast models developed at Oregon Health & Science University ("OHSU"). Koekkoek Decl. ¶¶ 13, 19. In mid-July, the OHSU modeling for a faster-spreading variant and slower vaccination rates predicted a September peak exceeding 1,000 COVID-19 hospitalizations in Oregon. Koekkoek Decl. ¶ 19(a), Ex. 4 at 19. By August 26, 2021, the statewide census exceeded 1,000 COVID-19 hospitalizations, and an updated model from OHSU predicted that there would be a

---

[7] The declaration of Dr. Koekkoek contains a scrivener's error. The paragraphs proceeding ¶ 36 begin at "33". See Koekkoek Decl. at 11. The Court refers to the corrected paragraph number.

peak of approximately 1,200 COVID-19 hospitalizations by September 6—effectively doubling the previous record in November 2020. Koekkoek Decl. ¶ 19(b), Ex. 5 at 23.

With the growing surge and severity of COVID-19 cases, Defendant reasonably believed that it faced a foundational risk to its ability to deliver healthcare services. Koekkoek Decl. ¶¶ 22-23. Defendant convened an Ethical Discernment process to evaluate whether it should require its employees to be vaccinated against COVID-19. Koekkoek Decl. ¶ 24. On July 21, 2021, the Ethical Discernment team reviewed and discussed internal infection prevention data, as well as publicly available information regarding COVID-19 and the vaccines. *Id.* ¶¶ 26, 31.

As part of the ethical discernment process related to the COVID-19 Vaccination Policy, Dr. Koekkoek used his medical background and clinical expertise to synthesize the medical and scientific literature and recommendations from regulatory and accrediting bodies, commonly referenced publications in highly reputable, peer-reviewed medical journals, and epidemiologic, and public health bodies to provide clinical expertise to others on the Ethical Discernment team. *Id.* ¶ 31. For example, Dr. Koekkoek relied on an August 2, 2021 study published in the New England Journal of Medicine which showed that through the end of June 2021, COVID-19 vaccines had averted an estimated 279,000 deaths and 1.25 million hospitalizations in the United States. *Id.* ¶ 33, Ex. 9[8] (concluding, "[a]s the delta variant affects various countries, including the United States, the current imperative is to vaccinate as many people as possible, as quickly as possible."). Dr. Koekkoek also relied on The Thompson Study, published in the New England Journal of Medicine on June 30, 2021. Koekkoek Decl. Ex. 10[9] ("Thompson Study"). The

---

[8] Stephen J.W. Evans, M.Sc., and Nicholas P. Jewell, Ph.D., *Vaccine Effectiveness Studies in the Field*, The New England Journal of Medicine, Aug. 2. 2021.

[9] Mark G. Thompson, et al., *Prevention and Attenuation of Covid-19 with the BNT162b2 and mRNA-1273 Vaccines*, 385(4) N. Eng. J. Med. 320–329 (June 30, 2021).

Thompson Study researchers "conducted a prospective cohort study involving 3975 health care personnel, first responders, and other essential and frontline workers." Thompson Study at 1. The results showed that being fully vaccinated reduced the risk of infection by 91% and still protected against severe illness and hospitalization if breakthrough infection occurred. Koekkoek Decl. ¶ 34, Thompson Study at 1. Some of the other sources that Dr. Koekkoek consulted included the Oregon Health Authority, the Washington Department of Health, the Centers for Medicare and Medicaid Services, the Centers for Disease Control, the World Health Organization, and the Association for Professionals in Infection Control and Epidemiology. Koekkoek Decl. ¶ 31. Dr. Koekkoek's synthesis of medical and scientific literature and recommendations showed a broad consensus from reliable sources that the vaccines were safe and not only protected the vaccine recipient from contracting the virus but also decreased the likelihood that the recipient would transmit the virus. Koekkoek Decl. ¶ 32.

Dr. Koekkoek advised the Ethical Discernment team that the protections afforded by vaccines were vitally important in healthcare facilities, where caregivers treated patients with COVID-19, and the risk of exposing other caregivers and patients, including children and elderly patients and patients with underlying conditions that make them particularly susceptible to COVID-19, was especially prevalent. *Id.* On July 27, 2021, after additional deliberation, the Ethical Discernment team decided unanimously that it would require all its employees to get vaccinated. *Id.* ¶ 27. A CDC report published two days later further supported the Ethical Discernment team decision. Koekkoek Decl. Ex. 11. The CDC report indicated that, when compared with vaccinated individuals, unvaccinated individuals were eight times more likely to contract COVID-19, twenty-five times more likely to be hospitalized if they got COVID-19, and

twenty-five times more likely to die as a result of a COVID-19 infection. Koekkoek Decl. ¶ 36, Ex. 11 at 3.

On August 3, 2021, Defendant announced it would require all employees to be fully vaccinated against COVID-19 by September 1, 2021, if able, and to show proof of COVID-19 vaccination or submit a medical exemption on or before August 31, 2021. Koekkoek Decl. ¶ 29; Le Decl. ¶ 10, Ex. 2 at 3. Defendant included information about seeking medical and religious exemptions to the policy but had not yet finalized a decision as to how it would accommodate employees with approved exemptions. Le Decl. ¶ 12, Ex. 4 at 2, 4; Koekkoek Decl. ¶ 29.

On August 4, 2021, Oregon Governor Brown announced that the OHA was issuing a regulation to require all Oregon healthcare providers and staff to be fully vaccinated against COVID-19 or submit to regular testing; the OHA issued a temporary rule to that effect one day later. Or. Admin. R. 333-019-1010 ("OHA Rule"). Initially, the OHA Rule provided two alternatives for healthcare workers to either: (1) be fully vaccinated by September 30, 2021, or (2) submit to weekly testing. Or. Admin. R. 333-019-1010 (eff. Aug. 5, 2021, to Aug. 24, 2021). However, on August 19, 2021, Governor Brown announced that the OHA would be updating its rule to remove the testing option and require healthcare workers to be fully vaccinated by October 18, 2021, unless they had a documented religious or medical exemption. Governor Kate Brown, Governor Brown Press Conference 8.19.2021, at 22:30, YOUTUBE (Aug. 19, 2021), https://www.youtube.com/watch?v=AxfQIRoPjyw.

On August 16, 2021, the Ethical Discernment team met again to consider potential changes to the COVID-19 Vaccine Requirement Policy and accommodations in light of updated guidance, employee feedback, and the OHA Rule. Koekkoek Decl. ¶ 42, Ex. 18. Defendant's internal epidemiological study determined that its patients were 7.1 times more likely to have

been exposed to COVID-19 and 11.6 times more likely to get COVID-19 from an unvaccinated employee as compared to a vaccinated employee. Koekkoek Decl. ¶ 21; Kroll Decl. ¶ 19, Exs. 3, 4. This data were collected while Defendant's other methods of risk exposure mitigation—such as PPE (including N95 masks), testing, social distancing, restrictions on visitation, and additional hand hygiene protocols—were already the "baseline" requirements in use. Koekkoek Decl. ¶ 44. Because of the substantial increase of patient infections due to exposure from unvaccinated employees, the Ethical Discernment team reaffirmed its overall position requiring all employees, absent an approved medical or religious exemption, to be fully vaccinated against COVID-19. *Id.* ¶ 42.

Defendant then considered potential accommodations for exempted employees who could not work fully remotely. *Id.* ¶ 43. While Defendant generally concluded that multiple methods of protection against COVID-19 were important, the medical science at the time confirmed that vaccination was the single most important method. *Id.* Unlike vaccination, the "baseline" requirements did not provide continuous protection 24 hours per day and were susceptible to human error. *Id.* ¶ 44. The Ethical Discernment team concluded that the so-called baseline requirements were no longer sufficient. *Id.* ¶¶ 43-44. Defendant determined that allowing unvaccinated employees to work in person would have subjected other employees and patients to a higher risk of contracting COVID-19, amplifying the risk of severe illness or death among its patients. *Id.* ¶ 48.

Defendant then established a committee to review religious exemption requests and began processing such requests. Le Decl. ¶ 18. When Defendant approved a request for religious exemption, the employee's HR partner or supervisor initiated an interview with the employee. *See* Le Decl. ¶¶ 21, 31. However, because Defendant determined that contact between

unvaccinated employees and patients or coworkers posed an unacceptable health and safety risk, the only substantive issue during these interviews was whether the employee could perform the essential functions of their position fully remotely. Le Decl. ¶ 21. Defendant placed employees who could not work fully remotely on unpaid leave, permitting use of remaining PTO and continuing their health benefits coverage through the later of November 30, 2021, or the end of the month in which they exhausted PTO. Le Decl. ¶ 23. By August 31, 2021, the review committee had approved 219 of the 226 religious exemption requests it received from its Oregon employees. Le Decl. ¶ 19.

Plaintiff requested a religious exemption to Defendant's COVID-19 vaccine requirement, which Defendant approved. Le Decl. ¶ 30, Ex. 14; Riggs Decl. I Ex. 1 at 9 (RFA Response No. 4). Plaintiff's supervisor and HR partner interviewed Plaintiff to process her request and determined that she could not perform her duties as a medical assistant fully remotely. Le Decl. ¶ 30, Ex. 15; Riggs Decl. I Ex. 1 at 9 (RFA Response Nos. 2, 3). Plaintiff admits that she could not perform the essential functions of her position fully remotely. Riggs Decl. I Ex. 1 at 9 (RFA Response Nos. 2, 3). On September 1, 2021, Defendant placed Plaintiff on unpaid administrative leave. Le Decl. ¶ 32.

3.    <u>Analysis</u>

Defendant's determination—that contact between unvaccinated employees and co-workers, patients, and community members in its facilities posed an unacceptable health and safety risk—was directly supported by its internal epidemiological study, consensus among the scientific medical community at the time, and reliance on guidance from authoritative sources such as the CDC and the OHA. The Court finds there is no genuine dispute of fact that allowing unvaccinated employees to work in person significantly increased health and safety risks to its employees and patients at times relevant in this Complaint. Plaintiff does not dispute that she

could not perform her job fully remotely and that performance of her job required close contact with other employees and direct care to medically vulnerable individuals. Defendant reasonably concluded that the health and safety risks of allowing unvaccinated employees to work in person created a substantial burden by conflicting directly with its business mission to provide safe and adequate healthcare to the community. Defendant also considered the number of employees seeking a similar accommodation and reasonably concluded that the cumulative burden was substantial.

Plaintiff does not dispute that Defendant conducted an interview with her before making its determination that she could not perform her job fully remotely. Plaintiff argues, without evidence or supporting case law, that Defendant owed her more process before placing her on leave. Defendant's decision to place Plaintiff on unpaid leave was made after it met with her and determined that she could not perform her job fully remotely. Defendant was in the midst of a healthcare crisis which posed an existential threat to its operational abilities. It had hundreds of religious and medical exemption requests to process in a short amount of time. Defendant's decision to place Plaintiff on unpaid leave was made individually. Having reviewed the evidence in the record, the Court finds that there is no genuine dispute of material fact that any accommodation other than leave would have posed an undue hardship on Defendant. Because Defendant has successfully established the affirmative defense of undue hardship, the Court grants Defendant's Motion for Summary Judgment.

/ / /

/ / /

/ / /

/ / /

**CONCLUSION**

For the reasons above, Defendant's motion to strike (ECF No. 26) and motion for

summary judgment (ECF No. 15) are GRANTED.

DATED this 5th day of December 2024.


                                        s/ Mustafa T. Kasubhai
                                        MUSTAFA T. KASUBHAI (He / Him)
                                        United States District Judge